hPETERS, J.,
dissenting.
E.C.’s single assignment of error is that the state failed to establish its burden of proof required in a child in need of care case. Given the procedural defects and the evidence presented in this litigation, I agree with that assertion. Therefore, I respectfully dissent from the majority result and would reverse the trial court’s judgment awarding custody of the twins to S.S., their father. I agree with E.C. that this litigation evolved into nothing more than a civil custody dispute held under the juvenile process umbrella. In my opinion, therein lies a fundamental flaw that requires reversal.
The substantive law concerning resolution of custody litigation involving illegitimate children is found in La.Civ.Code art. 131 et seq. See La.Civ.Code art. 245. Enforcement of an alleged custody right is initiated by filing a pleading which presents the demand for enforcement of that right to a court of competent jurisdiction. La.Code Civ.P. art. 421. The award of custody is based on the best interests of the child. La.Civ.Code art. 131. Procedurally, the litigation applies provisions of the Louisiana Code of Civil Procedure.
A child in need of care proceeding bears no resemblance to a civil custody action. Unlike a civil custody proceeding where the parents are the adversarial parties at interest in the litigation, the adversarial parties at interest in a child in need of care ^proceeding are the State of Louisiana, through the Department of Social Services (department), and the party or parties deprived of custody. The proceedings are initiated when “[a] peace officer, district attorney, or employee of the local child protection unit of the department” files “a verified complaint alleging facts showing that there are reasonable grounds to believe that the child is in need of care and that emergency removal is necessary to secure the child’s protection.” La.Ch. Code art. 619(A). To assert “reasonable grounds,” the individual submitting the verified complaint must assert that at least one of the grounds set forth in La.Ch.Code art. 606 exists.
Once the trial court receives the verified complaint, it must do two things: (1) It must first conclude that the verified complaint contains sufficient facts to establish the “reasonable grounds” that a child in need of care situation exists, La.Ch.Code art. 619(A), and (2) it must “determine whether reasonable efforts have been made by the department to prevent or eliminate the need for the child’s removal.” La.Ch.Code art. 619(B) (emphasis added). These are mandatory inquiries of the trial court before it can issue an instanter custody order.
In exceptional circumstances, the trial court may issue an oral instanter custody order based on orally communicated assertions from the three reporters cited in La.Ch.Code art. 619(A). La.Ch.Code art. 620. If such exceptional circumstances exist, and if the trial court issues an oral instanter custody order based on the orally communicated assertions, the department *585 must file an affidavit containing the alleged facts relied upon “with the clerk of the court within twenty-four hours” of presentation to the trial judge. La.Ch.Code art. 620(B). In any event, the oral instanter custody order must be reduced to writing after the affidavit is filed and it 13must contain “findings of fact supporting the necessity for the child’s removal in order to safeguard his welfare.” La.Ch.Code art. 620(B).
The purpose of the child in need of care provisions is set forth in La.Ch.Code art. 601 as follows:
The purpose of this Title is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others, by providing for the reporting of suspected cases of abuse, exploitation, or neglect of children; by providing for the investigation of such complaints; and by providing, if necessary, for the resolution of child in need of care proceedings in the courts. ... This Title is intended to provide the greatest possible protection as promptly as possible for such children. ... This Title shall be administered and interpreted to avoid unnecessary interference with family privacy and trauma to the child, and yet, at the same time, authorize the protective and preventive intervention needed for the health, safety, and well-being of children.
(Emphasis added.)
Thus, the child in need of care process contemplates an investigation based on a report of grounds under La.Ch.Code art. 606 and resolution of the problem without unnecessary intervention. Court intervention is a last resort. The obvious purpose of the requirements of La.Ch.Code art. 619 and La.Ch.Code art. 620 is to allow the matter to proceed through the appropriate investigative process and then to an impartial judge for action. However, that is not what happened in this case.
The juvenile judge in this matter issued an oral instanter order transferring custody of the twins to the department and awarded their father physical possession. This order was issued based on a telephone conversation, not with any agency representative listed in La.Ch.Code art. 619(A), but with the children’s maternal grandmother. Thus, no investigation by the department ever took place. By engaging in the ex parte communication with the grandmother and not referring her to the |4department, the juvenile judge became a “permitted reporter” together with the grandmother, as is authorized by La. Ch.Code art. 609(B). However, once the juvenile judge assumed that position, her obligation was, not to issue an order, but to forward the acquired information to “the local child protection unit of the department” La.Ch.Code art. 610(A) (emphasis added).
All of the evidence suggests the order was orally communicated to the department because the first written evidence of action by the trial court is the response of Janice Upton, the department’s representative, who filed an affidavit on February 16, 2000, or within twenty-four hours of the issuance of the oral instanter order. However, instead of asserting facts upon which the custody action was taken, the affidavit basically asserted that “[o]n 2/15/2000, [the juvenile judge] ordered the children to be placed in the legal custody of the State of Louisiana with physical placement with the father.” In addressing her belief that there was good cause to suggest the twins could not adequately be protected, Ms. Upton stated “as per [the juvenile judge’s] order of 2/15/2000.” Concerning the requirement that consideration *586 be given to services provided by the department to prevent removal, Ms. Upton stated “as per [the juvenile judge’s] order of 2/15/2000.” Additionally, Ms. Upton testified that she was informed that the department was given custody because the juvenile judge “had concerns that the mother may take the children and flee the state” and that, had she investigated the matter, she would not have requested an order of custody but would have referred the family to help as a family in need of services under La.Ch.Code art. 726 et seq. Had this occurred, this litigation would have ended at that point.
Having begun, however, this litigation should have not been extended past the | Rcontinued custody hearing held February 17, 2000. The department bears the burden at that hearing of establishing a ground for continued custody. La.Ch. Code art. 624(D). That burden requires a showing that “there are reasonable grounds to believe the child is in need of care and that continued custody is necessary for his safety and protection.” La. Ch.Code art. 626(A) (emphasis added). At this point, the only basis for continued custody was the fear that E.C. might take the children from the state. Therefore, there existed no basis for a child in need of care action.
I disagree that the child in need of care stipulation entered into at the continued custody hearing rendered moot any complaints of the prior procedural defects. Importantly, La.Ch.Code art. 647 provides:
With the approval of the petitioner and the department, if a child is in the custody of the department, a parent whose child is the subject of pending proceedings may, with or without admitting the allegations of the petition, stipulate that the child is in need of care according to Article 606, provided that:
(1) A prehearing conference has been convened in accordance with Article 646.1.
(2) The parent personally appears before the court.
(3) The court fully informs the parent of his rights as required by Article 625.
(4) The court fully informs the parent of the consequences of such a stipulation, including the parent’s responsibility to comply with the case plan and correct the conditions requiring the child to be in care.
(5) The parent knowingly and voluntarily consents to the judgment.
In this case, the record does not demonstrate that the prerequisites for the trial court accepting E.C.’s stipulation have been met.
In any event, even assuming the prerequisites were met for a proper stipulation, I would still find that it should be disregarded in this case. E.C. is the mother of twins born out of wedlock. Both children suffer from attention deficit hyperactivity disorders (ADHD). Concerned only that E.C. might leave the state (a perfectly legal |fiact), E.C.’s own mother called the juvenile judge and “reported” her. This telephone call resulted in E.C. losing custody of her children without warning. Two days later, she found herself in front of the same juvenile judge and, in her mind, without hope of relief. Additionally, common sense would suggest that often the trial court is extremely reluctant to return children into an environment until more facts are known, and understandably so. I simply cannot hold E.C. to the same standard applicable in a civil custody proceeding, given the department’s involvement. While this ill-advised “stipulation” deprived E.C. of her children for an indefinite period in the future when there existed no basis in fact for continued custody, it should not be used to preclude her from *587 arguing the defects which brought her to that point. This conclusion is reenforced, in my mind, by the fact that the department sought a continuance before filing its petition for adjudication. Louisiana Children’s Code Article 632(A) requires that an adjudication petition be filed within thirty days of the continued custody hearing when the children remain in the custody of the department. The department sought and obtained an extension of time in which to file this petition because it needed to obtain the psychological evaluation by Dr. Simoneaux. The evidence establishes why this delay was necessary— the department had no basis for its petition until it received the report.
The nature of the adjudication hearing represents further evidence of the fact that this juvenile matter was treated as a civil custody proceeding and not a child in need of care proceeding. The adjudication hearing took place on November 29 and 30, 2000. Louisiana Children’s Code Article 666(A) provides that “[fjollowing the adjudication hearing, the court shall immediately declare whether the evidence warrants a child in need of care adjudication. In exceptional circumstances, the court [7may take the matter under advisement for a period not to exceed ten days.” (Emphasis added.) The trial court took the matter under advisement and did not issue written reasons for judgment until February 21, 2001.
Furthermore, the issue at the adjudication hearing is whether the children should be found to be in need of care, and nothing else. A separate hearing is required to determine disposition of children adjudicated in need of care. La.Ch.Code art. 678. The trial court’s reasons for judgment mentions neither “adjudication” nor “disposition” and begins with the sentence: “This matter comes before the Court in a complicated custody case.” (Emphasis added.) The trial court compared the father’s environment with that of the mother’s and concluded “that the placement of the children with the mother would be detrimental to the welfare of the children and that it is in the best interest of the children to continue to live with their father.” Thus, it appears that the continued custody hearing became an adjudication hearing and the adjudication hearing functioned as a disposition hearing.
Even assuming that somehow E.C. has waived her right to object to the utter failure of the department to follow the statutory procedure in this juvenile proceeding, I still find that the evidence presented does not rise to the level of proof required of the department.
In its petition, the department limited itself to the following assertions:
A. [E.C.] abandoned her children to her maternal grandparents, stating “come get these (expletives deleted) kids,” and placed their personal belongings on the porch of the maternal grandparents.
B. The mother is unable to attend to the special psychological needs of the children and is unable to provide a stable home for them.
In my opinion, the department established neither by a preponderance of the evidence.
| RC oncerning the first, the evidence is overwhelming that E.C. never abandoned her children. While she exhibited poor judgment in making the inappropriate comment to the children’s maternal grandmother, even the grandmother never asserted that she called S.S. to take physical possession of the twins because E.C. had abandoned them to her. On the contrary, she transferred the twins to S.S. and contacted the juvenile judge because she was concerned that E.C. would take the children from the state. Even so, I would find *588 that E.C. did not act inappropriately in bringing the children to their grandmother but instead acted in their best interest so that she could regroup — no one disputes that the children are difficult to manage. Moreover, this was an isolated incident, and E.C. returned for the children. Thus, E.C.’s assertion that the department failed to prove this assertion has merit.
In considering proof of the second assertion, the evidence in fact points to the contrary. Specifically, E.C. was the person who recognized the special psychological needs of the children in the first instance and sought help for them. Further, one has to evaluate the evidence without regard to whether S.S. or E.C. could provide the better home. Ms. Upton testified that, when the department finally attempted to perform its statutorily mandated investigation, it found no evidence of physical, sexual, or emotional abuse. In fact, her only criticism was that E.C. seemed to have neglected the children. Based solely on Dr. Simoneaux’s report, she concluded, not that E.C. could not provide a safe environment, but that “she could not provide the most structured environment ” to meet the children’s needs. However, she further admitted that she found no evidence to suggest that E.C. ever failed to provide the children with food, clothing, shelter, medical care, or even treatment or counseling for their emotional problems. Moreover, Ms. Upton admitted that this matter was not 19handled as a normal case when she testified as follows:
Under normal circumstances, when we remove a child we have a service plan, the agency requires a parent to do certain specific things to get custody back and if the parent does those things, and there is no, nothing to show a risk of harm to the child if the child is returned, that would be the normal process.
William Norton, the department employee who initially was involved with placement of the twins, testified that, although E.C. complied with everything requested of her, the department still recommended placement with S.S. and release of the department from all responsibility. He based this recommendation solely on Dr. Simo-neaux’s conclusion that S.S. was “suited to care for his children.”
Even the woman who started this unfortunate litigation in the first place, E.C.’s mother, testified that her daughter loves the twins and the twins love her. She testified that E.C. has always properly cared for the twins and that E.C. did everything that a mother is suppose to do. As previously stated, E.C.’s mother reported to the juvenile judge, not because she was fearful of the children’s safety, but because she was concerned that E.C. might leave the state. Everyone acknowledges a difficult relationship exists between the two women, and the obvious reason can be summarized in a statement by E.C.’s mother when questioned about their relationship:
The only time we argue, Mr. Kennedy, is when I correct Erin as a mother and she doesn’t, she doesn’t take too well to correction and I guess that’s just part of the mother in me, but I will continue to do that and I told her I will always continue to do that because I was always, I will always be her mother. And as you know, she’s adopted and she has never really bonded with us. Perhaps that had something to do with it.
I find myself sympathizing with E.C. having to raise two ADHD children and having to cope with a mother who obviously wants to control her life despite the fact that E.C. is an adult with teenage children.
lifiDr. Simoneaux’s testimony does not support a finding that the department bore its burden of proof either. The doctor *589 expressed concerns that the children would have an adverse effect on the marriages of either family if placed therein. While praising S.S., Dr. Simoneaux could find only that E.C.’s stability was “questionable.” However, the doctor acknowledged that the children were with E.C. when diagnosed with ADHD and that she immediately began working toward obtaining help for them.
While the evidence seems to suggest that the children are doing better in the current environment, one might be tempted to disregard the utter failure on the part of the department in abdicating its statutory duty and in meeting its burden of proof in order to pursue what it perceived to be the court’s desired result. To disregard that failure would be to relegate such proceedings under the Children’s Code to merely a determination of who is capable of providing the better or best environment for the children. Were that the standard, our courts could be inundated with litigation over whether one environment is better or best for a child, which could fluctuate from day to day, where there is no other basis for removal of the child from his or her present environment. Even in civil custody proceedings, a higher standard of proof is required for a change of custody than a mere showing that one parent is able to provide a better environment. Further, the means should not justify the end. The department simply did not meet its burden of proof in this ease by a preponderance of the evidence.
Perhaps the most troubling aspect of this litigation is that the department, the party most responsible for seeing that all rights are protected in a juvenile proceeding, has been released with no further responsibility for the problems it created. The release of the department by the trial court eliminates the possibility of E.C. ever | ^rehabilitating herself because no plan of rehabilitation exists.
In dissenting, I do not mean to suggest that S.S. would or would not be successful in a civil custody proceeding. However, the department has failed in its burden in this juvenile proceeding. I am concerned that the result in this case will be the use of the Louisiana Children’s Code as an offensive weapon in family disagreements rather than for its proper purpose as stated in La.Ch.Code art. 101: “The people of Louisiana recognize ... that the role of the state in the family is limited and should only be asserted when there is a serious threat to the family, the parents, or the child; and that extraordinary procedures established by law are meant to be used only when required by necessity and then with due respect for the rights of the parents, the children, and the institution of the family.”
I would reverse the trial court judgment and order the children returned to their mother.